IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN BERTOLETTE, | ) |
| Plaintiff, | ) Civil Action No. 2:23-cv-330 |
| v. | ) Judge W. Scott Hardy |
| | ) Magistrate Judge Patricia L. Dodge |
| GEORGE LITTLE, et al., | ) |
| Defendants. | ) |

**REPORT AND RECOMMENDATION**

**I.   RECOMMENDATION**

It is respectfully recommended that Defendants' Motion to Dismiss (ECF No. 36) be granted in part and denied in part.

**II.   REPORT**

**A.   Relevant Procedural History**

Plaintiff John Bertolette ("Bertolette") filed this *pro se* civil rights action along with a motion for leave to proceed *in forma pauperis* on February 28, 2023. (ECF No. 1.) He subsequently filed an Amended Complaint after being granted leave to do so. (ECF No. 15.) The Amended Complaint named Pennsylvania Department of Corrections ("DOC") officials George Little, Laurel Harry, Tabb Bickell, Trevor Wingard, Michael Zaken, S. Buzas, M. Dialesandro, M. Malanoski, M. Switzer, C. Swartz, J. McClelland, and D. Coulehan (collectively "Defendants"). (*Id.*) Bertolette asserted claims under the Eighth and Fourteenth Amendments stemming from his conditions of confinement at both State Correctional Institute ("SCI") Houtzdale and Greene and his placement on the Restricted Release List ("RRL"). (*Id.*)

Defendants moved to dismiss. (ECF No. 21.) On October 26, 2023, this Court issued a

Report and Recommendation that the motion be granted with leave to amend.[1] (ECF No. 29.) On December 22, 2023, the Honorable W. Scott Hardy adopted the Report and Recommendation as the Opinion of the Court. (ECF No. 30.)

Bertolette filed his Second Amended Complaint on January 4, 2024.[2] (ECF No. 31.) Defendants filed a second Motion to Dismiss. (ECF No. 36.) The motion has now been fully briefed and is ripe for consideration. (ECF Nos. 36, 37, 39, 40.)

    B.    **<u>Relevant Factual Allegations</u>**

On July 20, 2018, Bertolette was placed in the Restricted Housing Unit ("RHU") at SCI Houtzdale following a misconduct that he received after walking off his work detail. (ECF No. 31 ¶ 19.) He was found guilty of the misconduct at a disciplinary hearing and sentenced to serve 270 days on Disciplinary Custody ("DC") status. (*Id.* ¶ 21.) Despite completing his sentence on April 11, 2019, he remained in the RHU on Administrative Custody ("AC") status.[3] (*Id.* ¶ 22.) "Around the beginning of 2020," former DOC Secretary John Wetzel "signed-off" on Bertolette's placement on the RRL. (*Id.* ¶ 23)

Under DC-ADM 802, the only distinction between an AC inmate and an AC inmate who

---

[1] The Court recommended that: any claims in Count I seeking to challenge Bertolette's placement and continuation on Administrative Custody status at SCI Greene, placement on the RRL at SCI Greene or any alleged violation of DOC policies as violating his due process rights be dismissed with prejudice; the claim in Count I that Bertolette's continued RRL placement violated due process be dismissed without prejudice and with leave to amend; Count II be dismissed without prejudice and with leave to amend; Count III be dismissed with prejudice because deliberate indifference is an element of a § 1983 claim and not a standalone cause of action. (ECF No. 29 at 18.)

[2] The Second Amended Complaint brings a Fourteenth Amendment denial of due process claim and an Eighth Amendment cruel and unusual punishment claim against the same Defendants. (ECF No. 31.)

[3] In their brief, Defendants explain the applicable DOC policies and procedures for inmates housed in the RHU: DC-ADM 801 (Disciplinary Custody) and DC-ADM 802 (Administrative Custody). (ECF No. 37 at 5-8.) Defendants also note some recent changes to DC-ADM 802, Section 4 and attach the prior versions effective during the relevant period. (ECF Nos. 37-1, 37-2.) Bertolette cites and discusses these same DOC policies in his Second Amended Complaint. (*See, e.g.*, ECF No. 31 ¶¶ 27, 29, 56, 59, 108, 108, 112, 117.) As a result, the Court takes judicial notice of DC-ADM 801 and DC-ADM 802, which are available at https://www.pa.gov/en/agencies/cor/about-us/doc-policies.html.

has an RRL designation is the mechanism for releasing the inmate to General Population ("GP"). Under the current version of the policy, a non-RRL inmate can be released from AC status at any time by the Facility Manager or the Program Review Committee ("PRC"). DC-ADM 802 § 4.A.2. An RRL inmate, on the other hand, may be released to GP only after receiving written permission from the Executive Deputy Secretary for Institutional Operations ("EDSI").[4] DC-ADM 802 § 4.B.

Bertolette was transferred to SCI Greene on November 9, 2020, and immediately placed in the RHU. (*Id.* ¶ 24.) On July 8, 2021, he was enrolled in SCI Greene's Intensive Management Unit ("IMU") program. (*Id.* ¶ 44.) The IMU program consists of six phases designed to allow RRL inmates to work their way back into the prison's GP. (*Id.* ¶¶ 36-37.) Bertolette claims to have been advised multiple times by Defendants that his only chance of getting off the RRL is by completing the IMU program. (*Id.* ¶ 50.) That said, he challenges the length of the program, arguing that even if an inmate successfully completes all six phases, there is no guarantee that they would be permitted to reenter GP. (*Id.* ¶¶ 47-48.)

Bertolette states that he has unsuccessfully attempted to appeal his RRL status multiple times in accordance with DC-ADM 802. (*Id.* ¶ 56.) DOC policy dictates that all AC inmates be reviewed by the PRC roughly every 90 days. DC-ADM 802 § 2.D.5. RRL inmates are also afforded an annual review to determine whether they should remain on the RRL.[5] DC-ADM 802 § 2.D.10. While a PRC review can recommend that an inmate be removed from the RRL, Bertolette has never received such a recommendation. (ECF No. 31 ¶ 59.) Bertolette admits that he has received some PRC reviews over the years but alleges that these reviews are perfunctory

---

[4] Bertolette named former EDSI Tabb Bickell as a defendant. (ECF No. 31.)
[5] Several DOC officials conduct the review, but the EDSI has final decision-making authority. DC-ADM 802 § 2.D.10.

and, to date, have documented none of the concerns that he raised, have habitually contained false information, and are often incomplete. (ECF No. 31 ¶ 59.) He also alleges that during his time in the RHU at SCI Houtzdale from July 2018 until being transferred to SCI Greene in November 2020, he did not receive a single review. (*Id.* ¶ 59.) In fact, he claims that his first review did not occur until "the end of 2020, or the beginning of 2021," following his transfer to SCI Greene. (*Id.* ¶ 63-64.) His next review did not take place until October 31, 2022. (*Id.* ¶ 71.) Further, Bertolette alleges that he "received no notice of this review, nor was he permitted to be present for, or otherwise participate," and that he has "never had any opportunity to meet with, talk to, or otherwise be heard by the reviewers" or to "present his views, advocate on his own behalf, or otherwise contest his RRL status." (*Id.* ¶¶ 65-66.)

Bertolette also makes many complaints about the cruel and unusual "deprivations and inhumane treatment, and restrictions that are significantly more severe towards him as an inmate on the RRL, confined in the RHU in indefinite solitary confinement compared to those imposed upon inmates in GP[.]" (*Id.* ¶ 80.) Among other things, he alleges that since July 20, 2018, he has endured: constant 24/7 illumination in his cell; "adversarial" interactions with staff who he asserts play "mind games" with him; denial of all physical contact with his family for over five years; physical "handling" by no less than two DOC staff members any time he leaves his cell; denial of "nearly all educational, rehabilitative, and vocational programming which is available to inmates in GP, including programming that is required for him to meet parole eligibility"; denial of all religious services; and the overall denial of any form of due process with respect to his RRL placement. (*Id.*) He contends that these conditions are much more severe than those applied to inmates in GP and are even more severe than those imposed on non-RRL AC inmates being housed in the RHU. (*Id.* ¶ 81.) Additionally, Bertolette alleges he has only received one

4

psych evaluation since arriving at SCI Greene in November 2020.  (*Id*. ¶ 98.)

### C.      Legal Standard

Under the Federal Rules of Civil Procedure, a complaint may be dismissed, in whole or in part, for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  In deciding a Rule 12(b)(6) motion, the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).  While "accept[ing] all of the complaint's well-pleaded facts as true," the court "may disregard any legal conclusions." *Id.* at 210-11.  Further, in considering a motion to dismiss, the court "generally considers only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004).

A complaint requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  To survive a motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Though 'detailed factual allegations' are not required, a complaint must do more than simply provide 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).  In short, the

plaintiff "must plead facts sufficient to show that [their] claim has substantive plausibility." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10 (2014).

To assess the sufficiency of a complaint under *Twombly* and *Iqbal*, a court must: (1) outline the elements plaintiff must plead to state a claim for relief; (2) peel away allegations that amount to mere conclusions and are thus not entitled to the assumption of truth; and (3) look for well-pled factual allegations, assume their veracity, and determine whether they plausibly give rise to an entitlement to relief. *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). The court's plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

The Supreme Court has stated that "the allegations of [a] *pro se* complaint [are held] to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972). If a claim "is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips*, 515 F.3d at 236 (citing *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002)). "An amendment is futile if the amended complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted." *Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000).

D. **Discussion**

Bertolette's claims are brought pursuant to 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Section 1983 does not itself create any substantive rights; it simply provides a cause of action that allows the plaintiff to vindicate rights that have already been secured. *See, e.g.*, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002)

6

("§ 1983 merely provides a mechanism for enforcing individual rights 'secured' elsewhere").

Bertolette alleges violations of the Eighth and Fourteenth Amendments. U.S. Const. amend. VIII, XIV. He claims that Defendants violated his rights by continuing to uphold his RRL placement, thereby indefinitely subjecting him to inhumane conditions of confinement without due process.

### 1. Eighth Amendment claim

The Eighth Amendment prohibits cruel and unusual punishment that "violates civilized standards of humanity and decency." *Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997). Prison conditions are cruel and unusual if they deprive inmates of basic human needs, such as food, sanitation, and medical care. *Rhodes v. Chapman*, 452 U.S. 337, 347-48 (1981). The Eighth Amendment does not, however, require prisons to be comfortable. *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 373 (3d Cir. 2019) (citing *Rhodes*, 452 U.S. at 349). To succeed on a claim brought under the Eighth Amendment, a prisoner must show: (1) that they were subjected to a deprivation that was "objectively, sufficiently serious; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities"; and (2) that prison officials acted with "deliberate indifference to the prisoner's . . . needs," which occurs only if the official "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994).

The District Court previously determined that, when viewing the allegations in the light most favorable to the non-moving party, Bertolette pleaded a combination of conditions that, taken as a whole, may represent an Eighth Amendment claim. (ECF No. 30 at 3) ("[T]he Court agrees with Judge Dodge's determination that in Count II Bertolette has alleged a combination of conditions (being in administrative custody for years without an end in sight and the alleged

7

conditions of his confinement) that, together, may represent an Eighth Amendment claim[.]") As the Amended Complaint sets forth the same allegations as Bertolette's original complaint, at this early stage of litigation, the Court again finds that Bertolette has adequately pleaded that these deprivations were objectively serious. (*See* ECF No. 29 at 14-16.)

Defendants nonetheless argue that Bertolette failed to plead facts sufficient to show their personal involvement, as required for any action brought under § 1983. (ECF No. 37 at 12-15.) They contend that the claims against Harry, Little, and Wingard are especially deficient because, although the allegations "are based on their positions as alleged policymakers[,]" Bertolette "has not sufficiently alleged that any of the policies in question are unconstitutional."[6] (*Id.* at 14.) As to the other named individuals, they argue that Bertolette failed to allege facts sufficient to show personal involvement "in managing his particular prison conditions that form the basis of his Eighth Amendment claim[.]"[7] (*Id.* at 15.)

a. Harry and Little

A § 1983 plaintiff bears the burden of showing that each named defendant was personally involved in the alleged constitutional violation. *See Saisi v. Murray*, 822 Fed. Appx. 47, 48 (3d Cir. 2020). *Respondeat superior* alone cannot be the basis for liability in a § 1983 action. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Instead, courts have identified two ways in which an individual may be found liable for the constitutional misconduct of a subordinate. First, a policymaker defendant may be liable under § 1983 "if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice or

---

[6] The Court finds the allegations against Wingard distinguishable from those against Harry and Little. Wingard is therefore included in the discussion of personal involvement as to the other named Defendants.
[7] As the Court construes Defendants' personal involvement argument, Defendants seek dismissal of both claims against Harry, Little, and Wingard and dismissal of only the Eighth Amendment claim against all other Defendants.

8

custom which directly caused the constitutional harm.'" *A.M. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir.1989)).

Following the disposition of the prior motion to dismiss, Bertolette amended his complaint to include a lengthy section titled "Each Defendants' Personal Involvement." (ECF No. 37 ¶¶ 101-262.)  Harry, in their role as former DOC Secretary, and Little, the current DOC Secretary, have final authority over all DOC policies.  Bertolette alleges that Harry and Little, "being fully aware and understanding the harmful effects of solitary confinement," created and maintained policies "that required Mr. Bertolette to remain in solitary confinement on the RRL" and "which specifically den[ied] him the ability to appeal his RRL status." (*Id.* ¶¶ 108-9.)

Beyond these general and somewhat vague allegations, there is no indication that these two Defendants were personally involved in the decision to uphold Bertolette's AC status or in any failure to comply with DOC policies governing his continuation on the RRL.  There is also no allegation that Harry or Little ignored any of his attempts to appeal his RRL placement.  Further, as Defendants correctly point out, the relevant DOC policies and procedures have already withstood constitutional scrutiny and thus cannot themselves be used as the basis for liability. *See Bowen v. Ryan*, 248 Fed. Appx. 302, 304 (3d Cir. 2007) (finding DOC procedures for RRL placement constitutional); *Shoats v. Horn*, 213 F.3d 140 (3d Cir. 2000) (holding that periodic review of inmates indefinitely confined to AC meets minimum due process requirements); *see also Blount v. Unit Manager Ackrom*, 2024 U.S. Dist. LEXIS 98766, at *15 (W.D. Pa. Jun. 4, 2024) (noting *Bowen* forecloses plaintiff from facially challenging RRL procedures).  Because none of the allegations give rise to a plausible inference that Harry or Little had actual knowledge of a constitutional violation, the Eighth Amendment claim against them should be dismissed.  As this

9

is already Bertolette's Second Amended Complaint, the dismissal should be with prejudice.

      b. <u>Bickell, Wingard, Zaken, Buzas, Dialesandro, Malanoski, Switzer, Swartz, McClelland, and Coulehan</u>

Liability can also attach when a defendant "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in [their] subordinates' violations." *A.M.*, 372 F.3d at 586. Constructive knowledge is not enough. *See Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) ("Although a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive."). The allegations must be made with appropriate particularity and must sufficiently describe the defendant's participation in or actual knowledge of and acquiescence in the alleged misconduct. *Id.* (citing *Rode*, 845 F.2d at 1207); *see also Mack v. Clark*, 2022 U.S. Dist. LEXIS 121813, at *12 (W.D. Pa. Jul. 11, 2022) ("Allegations that broadly implicate multiple defendants without delineating individual conduct are legally insufficient.").

As to all other Defendants besides Harry and Little, Bertolette alleges that each played a role in the continuation of his RRL status. He outlines specific allegations against each of these Defendants, including Wingard,[8] and details their alleged roles in performing his PRC reviews. (*See, e.g.*, ECF No. 31 ¶¶ 127, 129-32, 134-35, 139-57, 161-233, 236-50.) At various points, he states that these individuals had "first-hand knowledge" or "direct information" and even claims to have "directly addressed" some about the harm he was experiencing as a result of being kept in solitary confinement for an indefinite period of time. (*See, e.g.*, *id.* ¶¶ 146, 157, 165, 190.) Yet,

---

[8] For example, Bertolette alleges that Wingard "reviewed Mr. Bertolette's RRL status twice . . . where in both cases, he recommended to continue him on the indefinite status." (ECF No. 31 ¶ 140.) He also alleges Wingard "had first-hand knowledge of Mr. Bertolette's situation, from the multiple letters Mr. Bertolette sent him, which state the amount of time he spent in solitary confinement, and which state in detail the harm he is suffering as a result, and his concerns for experiencing additional harm." (*Id.* ¶ 146.)

despite being "personally aware that he was experiencing harm as a result of his confinement," he maintains that these Defendants were deliberately indifferent by "fail[ing] to report this harm or take any action to correct it, leaving him to face continued harm." (*Id.* ¶ 279.)

Thus, despite Defendants' argument that they had no personal involvement in managing the prison conditions that form the basis of Bertolette's Eighth Amendment claim, it is plausibly alleged that these Defendants had actual knowledge of the allegedly unconstitutional prison conditions and acquiesced to this violation. At this early stage of litigation, these allegations are therefore sufficient to demonstrate personal involvement. As such, the Eighth Amendment claim against Bickell, Wingard, Zaken, Buzas, Dialesandro, Malanoski, Switzer, Swartz, McClelland, and Coulehan survives dismissal.

### 2. Fourteenth Amendment claim

Next, Bertolette alleges that Defendants violated his Fourteenth Amendment rights by continuing his placement on the RRL "without any legitimate means by which to challenge his confinement," and without affording him "any type of process whatsoever." (ECF No. 31 ¶¶ 269, 272.) Defendants move to dismiss, arguing that Bertolette's due process rights "are entirely satisfied by his regular AC reviews." (ECF No. 37 at 9.)

The analysis for a procedural due process claim begins with determining whether the liberty interest asserted is protected under the Fourteenth Amendment. *Montanez v. Sec'y Dep't Corr.*, 773 F.3d 472, 482-83 (3d Cir. 2014). If the asserted interest is protected, the court must determine what process is required to protect it. If the interest is not protected, no process is necessary. *Newman v. Beard*, 617 F.3d 775, 783 (3d Cir. 2010). Thus, Bertolette must first plead facts that, if true, establish that he had a protected liberty interest that triggered due process rights.

Prisoners do not enjoy the same liberty interests as non-incarcerated citizens. *See Sandin*

*v. Conner*, 515 U.S. 472, 485 (1995). "[L]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id.* (quoting *Jones v. N.C. Prisoners' Lab. Union, Inc.,* 433 U.S. 119, 125 (1977)). "To rise to the level of a liberty interest, the right alleged must confer 'freedom from restraint which . . . imposes *atypical and significant hardship* on the inmate in relation to the ordinary incidents of prison life.'" *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 559 (3d Cir. 2017) (emphasis in *Williams*) (quoting *Griffin*, 112 F.3d at 708)). In making this assessment, a court must consider: "(1) the duration of the challenged conditions; and (2) whether the conditions overall imposed a significant hardship in relation to the ordinary incidents of prison life." *Id.* (quoting *Shoats*, 213 F.3d at 144). "The more restrictive the conditions are, the shorter the period of confinement is tolerated. Conversely, the less restrictive, the longer the period is before it becomes a hardship." *Wayne v. Clark*, 2022 U.S. Dist. LEXIS 232931, at *18 (W.D. Pa. Dec. 29, 2022).

No bright line defines where the duration of an inmate's segregation becomes atypical. *Williams*, 848 F.3d 549 at 561-62. Third Circuit precedent is clear that eight years in prolonged, indefinite solitary confinement implicates a liberty interest. *See Shoats*, 213 F.3d at 144. Yet courts have also found that fifteen months in disciplinary custody does not implicate due process concerns. *See Griffin*, 112 F.3d at 708. In his complaint, Bertolette alleges that he has spent over four years on the RRL and almost six years in the RHU under severely restrictive conditions. Based on this, the length of his confinement in prolonged isolation is atypical.

On the issue of signficant hardship, a court must consider the nature of the prison conditions in relation to the ordinary incidents of prison life, including "access to open air activites without strip searches, regular access to windows and natural light; daily access to showers; and the right

12

to more frequent visits where contact is permitted." *Williams*, 848 F.3d at 563. The court may also examine access to group religious services, jobs, and vocational programs, group sports, and telephone calls; human contact with individuals other than prison staff; the ability to qualify for parole; the hours a day confined to the cell; and whether the inmate eats meals alone. *Id.* at 562-664. In *Williams*, a signficant hardship was found to exist where an inmate was confined to his cell for twenty-two to twenty-four hours a day indefinitely, ate his meals alone in his cell, was "placed inside a small locked cage during much of the limited time he was allowed to leave his cell and . . . was subject to invasive strip searches each time he left his cell for exercise." *Id.* at 563.

Bertolette has alleged sufficient facts which, if proven, demonstrate that his time spent in the RHU and on the RRL amounted to an atypical and significant hardship. He eats all meals alone in his cell, where he is confined for twenty-two hours a day. He is exposed to constant artificial illumination and very little natural sunlight. He is subject to mandatory strip searches and possible cavity searches any time he leaves his cell. His only time outdoors, weather permitting, consists of two hours spent in a fenced-in exercise pen. He has been prohibited from having any contact visits with family members. He is denied access to nearly all educational and vocational programs and religious services. (ECF No. 31 ¶ 80.) These conditions, combined with the length of Bertolette's confinement in the RHU, amount to an atypical and significant hardship, thereby triggering a liberty interest. *See Wayne*, 2022 U.S. Dist. LEXIS 232931, at *18 (finding a protected liberty interest under similar circumstances).

Given the implication of a liberty interest, Bertolette must be given an "informal, nonadversary review" during which he is provided with an opportunity to state his position. *Shoats,* 213 F.3d at 144. As discussed above, Bertolette repeatedly alleges that he has not been

13

permitted to advocate, express his views, or to contest his continuation on the RRL. Thus, at this stage at least, he has minimally alleged facts that support a claim that he has not received the process he is due against Bickell, Wingard, Zaken, Buzas, Dialesandro, Malanoski, Switzer, Swartz, McClelland, and Coulehan.

As to Harry and Little, however, Bertolette's claim fails. The basis of Bertolette's Fourteenth Amendment claim appears to be that the applicable DOC policies governing inmate AC status, RRL continuation, and the mandatory PRC reviews were not followed.[9] (*See, e.g.*, ECF No. 31 ¶¶ 251-59.) The Court previously concluded that neither Harry nor Little had any personal involvement or actual knowledge of Bertolette's alleged plight. There is no reason to believe that either of them would have know that the other Defendants were failing to adhere to the required DOC policies by denying Bertolette the informal, nonadversarial reviews that he was due. Because Bertolette has not plausibly stated a Fourteenth Amendment claim against Harry and Little, this claim should be dismissed. Amendment in this instance would be futile, as Bertolette has already attempted to amend his complaint twice. The dismissal should therefore be with prejudice.

### III. CONCLUSION

For these reasons, it is respectfully recommended that:

> 1. The Eighth Amendment claim against Laurel Harry and George Little be dismissed with prejudice.
>
> 2. The Fourteenth Amendment claim against Laurel Harry and George Little be dismissed with prejudice.
>
> 3. Defendants' Motion to Dismiss (ECF No. 36) be denied in all other respects.

---

[9] Defendants interpret Bertolette's allegations this way as well. *See* ECF No. 37 at 14 ("Bertolette's chief complaint is that in some instances, the policies were not complied with.").

IV.   NOTICE

Pursuant to the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Civil Rules, the parties may, within fourteen (14) days, file objections to this Report and Recommendation. Failure to do so will waive the right to appeal. *Brightwell v. Lehman*, 637 F.3d 187, 193 n.7 (3d Cir. 2011).


Dated: August 6, 2024                                          s/Patricia L. Dodge
                                                               PATRICIA L. DODGE
                                                               United States Magistrate Judge



cc:   JOHN BERTOLETTE
      KK4787
      SCI GREENE
      169 Progress Drive
      Waynesburg, PA 15370